1    ROBBINS GELLER RUDMAN
     & DOWD LLP
2    SHAWN A. WILLIAMS (213113)
     Post Montgomery Center
3    One Montgomery Street, Suite 1800
     San Francisco, CA  94104
4    Telephone:  415/288-4545
     415/288-4534 (fax)
5    shawnw@rgrdlaw.com

6    ROBBINS GELLER RUDMAN
     & DOWD LLP
7    TRAVIS E. DOWNS III (148274)
     BENNY C. GOODMAN III (211302)
8    ERIK W. LUEDEKE (249211)
     655 West Broadway, Suite 1900
9    San Diego, CA  92101
     Telephone:  619/231-1058
10   619/231-7423 (fax)

11   Attorneys for Plaintiff

12   [Additional counsel appear on signature page.]

13                  UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RETIREMENT PLAN FOR POLICE OFFICERS & FIREFIGHTERS OF THE CITY OF NORTH MIAMI BEACH, Derivatively on Behalf of SPLUNK, INC., <br><br>           Plaintiff, <br><br>   vs. <br><br> DOUGLAS MERRITT and JASON CHILD, <br><br>          Defendants. <br><br>    – and – <br><br> SPLUNK, INC., a Delaware corporation, <br><br>         Nominal Defendant. | Case No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, WASTE OF CORPORATE ASSETS, VIOLATIONS OF THE FEDERAL SECURITIES LAWS, AND CONTRIBUTION AND INDEMNIFICATION <br><br><br><br><br> DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1. This is a shareholder derivative action on behalf of nominal defendant Splunk, Inc. ("Splunk" or the "Company") for breach of fiduciary duty, unjust enrichment, waste of corporate assets, violations of the federal securities laws, and contribution and indemnification against Jason Child and Douglas Merritt (together "defendants").  Defendants, at all relevant times, served as senior executives of Splunk.

2. Splunk is a data management software company based in San Francisco, California. Between at least May and December 2020, defendants knowingly made materially false and misleading statements about the Company's investments in marketing and sales, sales employee headcount, about the COVID-19 pandemic not having an adverse effect on the Company's fundamentals or its development of pipeline, *i.e.*, potential customers for the Company's products.

3. These statements were false and misleading when made and propelled the Company's common stock price to a high of $220.42 per share on August 28, 2020.  Using Splunk's inflated stock price defendants were able to complete a $1.2 billion debt offering on June 5, 2020, to continue to fund the Company's operations.  Defendants also used the Company's inflated stock price to obtain stockholder approval of a compensation package which increased their personal compensation to $39.02 million in 2020.  Further, while Splunk common stock traded at artificially inflated prices, defendants profited by selling 129,110 shares of their personal Splunk stock, at prices as high as $219.74, for $21,627,565 based on adverse material non-public information.

4. Contrary to defendants' public statements, Splunk was not investing in marketing or maintaining adequate sales personnel headcount to the extent necessary to build an adequate pipeline and meet the Company's growth and revenue targets.  To the contrary, defendants had suspended marketing investments and instituted a hiring freeze of sales personnel which lasted throughout 2020 and had laid off employees whose job was to build customer demand for the Company's products.

5. When the truth emerged in early December 2020, the Company's stock price fell by 23% to $158.03 per share on December 3, 2020, from $205.91 per share on December 2, 2020.  On December 2, 2020, the Company disclosed a significant earnings shortfall for 3Q20, ended September 30, 2020.  Year-over-year revenue declined by 11%, missing estimates by nearly $60

million.  The Company also announced its 3Q20 net loss increased to $201.5 million, an almost four times greater loss than the prior year.

6.     Due to defendants' misrepresentations, Splunk shareholders sued the Company and defendants for violations of federal securities laws in an expensive and costly-to-defend class action lawsuit.  *See In re Splunk Inc. Sec. Litig.*, No. 4:20-cv-08600-JST (N.D. Cal.) (the "Securities Action").

7.     On March 21, 2022, the United States District Court for the Northern District of California, the Honorable Jon S. Tigar presiding, sustained the shareholder plaintiff's claims for violations of §§10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") against the Company, notwithstanding the materially heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The Court found, *inter alia*, that defendants had: (i) failed to disclose adverse information which cut against their positive representations that the Company's investments in marketing were adequate to meet its growth and revenue targets; and (ii) falsely stated the Company had not laid off sales employees and instituted a hiring freeze throughout 2020.  *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 939, 943, 945 (N.D. Cal. 2022).

8.     By misleading Splunk's shareholders, defendants breached their fiduciary duty to avoid self-dealing and the dissemination of false company information and unjustly enriched themselves at Splunk's expense.  Nevertheless, Splunk's Board of Directors (the "Board"), has not, and will not, take legal action against defendants.  This fact is borne out by the Splunk Board's decision to effectively ignore plaintiff's litigation demand.

9.     Delaware corporation law requires a board of directors to timely accept or reject a litigation demand.  A board cannot lawfully defer or otherwise ignore its legal obligation to respond to a litigation demand.  But this unlawful course of action is precisely the one chosen by Splunk's Board.  Worse yet, while failing to discharge its own fiduciary duties, the Splunk Board is abetting defendants' defense of myriad lawsuits triggered by their knowing violations of the federal securities and Delaware corporation laws.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.     The best interests of Splunk are, plainly, not top of mind for the Company's Board. Accordingly, plaintiff brings this action to further Splunk's best interests.  The derivative claims asserted in this Complaint will protect Splunk's valuable claims against defendants and once finally adjudicated, make Splunk whole for damages and injuries suffered due to defendants' unlawful misconduct.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 because plaintiff's claims raise a federal question under §§10(b) and 21D of the Exchange Act, 15 U.S.C. §§78j(b) and 78u-4.  The Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     This Court has personal jurisdiction over each of the defendants because each defendant is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Moreover, Splunk is a corporation conducting business and maintaining operations in this District.

13.     Venue is proper in under 28 U.S.C. §1391 because: (a) Splunk maintains its principal executive offices in this District; (b) one or more of the defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein took place in this District; and (d) defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

14.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**THE PARTIES**

15.     Plaintiff Retirement Plan for Police Officers & Firefighters of the City of North Miami Beach[1] is, and continuously has been, Splunk shareholders since November 2017.  Plaintiff will adequately represent Splunk's interests in the derivative claims assert in the action.

16.     Nominal Defendant Splunk is incorporated in Delaware and maintains its principal executive offices at 270 Brannan Street, San Francisco, California 94107.

17.     Defendant Douglas Merritt served as President and Chief Executive Officer ("CEO") from 2015 until November 13, 2021.

18.     Defendant Jason Child served as Senior Vice President and Chief Financial Officer ("CFO") from May 2019 until September 2022.

**DEFENDANTS' FIDUCIARY DUTIES**

19.     In *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors." *Id*. at 708-09; *In re McDonald's Corp. Stockholder Deriv. Litig.*, C.A. No. 2021-0324-JTL (Del. Ch. Jan. 25, 2023).  The officers of a Delaware corporation are "expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care)." *Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *35 (Del. Ch. July 12, 2010).

20.     Moreover, "[u]nlike directors, corporate officers cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7), which permits a corporation to offer such protection to directors in a corporate charter."  *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *43; *Chen v. Howard-Anderson*, 87 A.3d 648, 686-87 (Del. Ch. 2014) (holding "the Exculpatory Provision [under §102(b)(7)] does not protect [the CEO] when acting in his officer capacity").

---

[1]     Formerly known as City of North Miami Beach Police Officers' and Firefighters' Retirement Plan.

21.     Instead, under Delaware law, corporate officers "face a statutory exposure to liability that is often greater than directors." *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *43; *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780-81 (Del. Ch. 2016) (holding that officers owe fiduciary duties identical to those of directors, but adding that officers are also "agents who report to the board of directors" and "have a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles").

22.     Here, defendants Child and Merritt, at all relevant times, served as principal executives of Splunk.  Therefore, defendants "cannot be shielded from personal liability by 8 *Del. C.* §102(b)(7)," but rather "can be held liable in damages to [Splunk] if they acted with gross negligence and caused injury to the corporation." *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *43-*44.  As detailed below, defendants, and each of them, breached their fiduciary duties of care and loyalty to Splunk by making materially false and misleading statements about the Company's investment in marketing and sales and whether the COVID-19 pandemic was having an adverse impact on Splunk's fundamentals or its development of pipeline.

23.     Additionally, as a part of their duties of care and loyalty, defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to Splunk shareholders, or the market generally, about the business of the corporation. *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("'Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.'") (citation omitted); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures. The law of partial disclosure is likewise clear: '[O]nce defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.'") (citation omitted); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the defendants breached their fiduciary duty of candor when

they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

24.     As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10 (Del. Ch. Aug. 15, 2007), "[w]hen . . . directors communicate with shareholders, they also must do so with ***complete candor***":

> Loyalty.  Good faith.  Independence. Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives.  Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

*Id.* at *10-*11.  These strict disclosure obligations apply to defendants, as officers of a Delaware corporation, with equal force.  *Gantler*, 965 A.2d at 709; *Hampshire Grp.*, 2010 Del. Ch. LEXIS 144, at *34-*35.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

25.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

26.     During all relevant times, defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they were.  In furtherance of this plan, conspiracy, and course of conduct, defendants collectively and individually took the actions set forth herein.

27.     The purpose and effect of defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise defendants' violations of law, including breaches of fiduciary duties, corporate waste, unjust enrichment, and violations of the federal securities laws; and (ii) disguise and misrepresent the Company's actual business and financial prospects.

28.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to release false and misleading statements purposefully, recklessly, or negligently.  Because the actions described herein occurred under the authority of the

1  Board, each of the defendants was a direct, necessary, and substantial participant in the conspiracy,

2  common enterprise, and/or common course of conduct complained of herein.

3      29.    Each of the defendants aided and abetted, and rendered substantial assistance, in the

4  wrongs complained of herein.  In taking such actions to substantially assist the commissions of the

5  wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,

6  substantially assisted the accomplishment of that wrongdoing, and was aware of their overall

7  contribution to and in furtherance of the wrongdoing.

8                              **FACTUAL ALLEGATIONS**

9      30.    Splunk is a data management software company.  Customers can use Splunk's

10  software products to analyze, monitor and search large electronic data sets.  Despite the promise of

11  its software product – over $80 billion – Splunk operated at a net loss ever since 2017, forcing the

12  Company to rely on cash infusions raised through equity and debt offerings.  As 2019 unfolded,

13  shareholders and securities analysts grew increasingly concerned about the impact of deficits on

14  Splunk's ability to generate earnings.  To allay these concerns, defendants embarked on an unlawful

15  scheme to convince Splunk shareholders that they expected Splunk to become profitable, *i.e.*, cash

16  flow positive, in the coming years, thus ending the Company's dependence on equity and debt

17  offerings to fund its operations.

18  **Defendants' Unlawful Scheme**

19      31.    Particularly, defendants stated in shareholder reports and earnings conference calls

20  and investors presentations that they saw Splunk becoming cash flow positive from operations by

21  fiscal 2022, ending on January 31, 2022, annual operating cash flow approaching $1 billion by fiscal

22  2023, ending on January 31, 2023, and based on these developments, Splunk generating sustainable

23  profits, instead of losses, in the years ahead.  Additionally, Splunk announced a new compensation

24  structure for defendants that links incentive compensation to cash flow gains.

25      32.    In 2020, defendants continued to make positive statements about Splunk's prospects

26  designed to allay concerns about its ability to generate positive cash flow and profits.  Specifically,

27  defendants told Splunk shareholders and analysts that the Company was making significant

28  investments in marketing to increase brand awareness and drive sales.  They also stated that Splunk

1  was making investments in sales personnel to enable the Company to meet its sales and revenue

2  objectives.  As the COVID-19 pandemic disrupted the world, defendants assured shareholders and

3  analysts that the pandemic was not having a material adverse impact on Splunk's ability to develop

4  its sales pipeline, and that its fundamentals remained solid.  Rather than contracting headcount,

5  defendants publicly said that Splunk was expanding its sales force to achieve its earnings targets.

6        33.    Defendant privately knew differently.  Rather than continuing to increase Splunk's

7  spending defendants curtailed the Company's operating expenses as 2020 unfolded.  Early in the

8  year, defendants suspended investments in marketing initiatives designed to build Splunk's brand

9  recognition and drive sales.  They also froze hiring and laid off key employees, including the entire

10 "new logo" group responsible for developing new business.  Together, these undisclosed actions

11 significantly curtailed Splunk's sales pipelines and led to a significant revenue shortfall in the third

12 quarter of Splunk's fiscal year 2021.  They also derailed Splunk's ability to achieve $1 billion in

13 positive cash flow through revenue generation by 2023.

14       34.    Significantly, it has been alleged in the Securities Action, based on the accounts of

15 several confidential witnesses, that defendant Merritt personally announced the Company's

16 suspension of marketing investments during an all-hands meeting in March 2022.  Similarly, it has

17 been alleged in the Securities Action, based on confidential witnesses, that Splunk started an across-

18 the-board hiring freeze in early 2020, which froze all hiring of sales personnel, the very people

19 needed to service the Company's sales, throughout 2020.  Further, it has been alleged in the

20 Securities Action, based on confidential witnesses, that beginning in mid-2020, Splunk began to lay

21 off employees, including employees in the "new logo" group responsible for bringing in new

22 customers, which impaired the Company's ability to grow new business.  In early December 2020,

23 when the truth emerged, defendant Child would confirm that, beginning in early March 2020, Splunk

24 "suspended investments in marketing" and "froze hiring," that the hiring freeze was for a "few

25 months," and that, as a result of these actions, "[Splunk] did have a tighter pipeline going into Q3,"

26 which resulted in lower revenues.

27       35.    Rather than publicly disclose these adverse, material, non-public facts, defendants

28 concealed these developments from Splunk shareholders and misrepresented the true condition of

Splunk's business, operations, and prospects for positive cash flow and profits.  To this end, defendants made false and misleading statements in shareholder reports and during earnings calls and presentations designed to mislead shareholders to believe that Splunk was continuing to make investments in marketing and sales personnel.  These false statements had the intended effect and artificially inflated the trading price of Splunk common stock, enabled the Company to complete a $1.2 billion debt offering, and allowed defendants to increase their personal executive compensation to $39.02 million.  Defendants' misrepresentations and omissions are contrary to the fiduciary duties of care and loyalty owed by defendants to speak the entire truth in Splunk's shareholders communications, and to always avoid self-dealing transactions resulting in personal gain.  Additionally, while Splunk stock traded at artificially inflated levels as high as $220.42 per share, defendants took advantage of the situation and sold 129,110 shares of their personal Splunk common stock, at prices as high as $219.74, for $21,627,565 before the truth emerged in December 2020.  These illicit stock sales breached defendants' fiduciary duty to avoid self-dealing.

36.    Specifically, on March 4, 2020, Splunk announced its financial results for the fourth quarter and full year ended January 31, 2020 in a press release filed with the SEC on Form 8-K.  It reported "Total ARR of $1.68 billion, up 54% year over year" and "Full Year Software Revenues Up 40%."  Defendant Merritt added:  "This was a transformational year for Splunk.  We have transitioned our business model, our product strategy and introduced new and enhanced pricing models as part of our company-wide, cloud-first approach.  These shifts have provided unprecedented value to our customers by bringing Data-to-Everything."  Defendant Child similarly stated:  "As we deliver increasing value from our expanding product capabilities, customers are turning to our cloud offerings more and more.  We expect our cloud products could represent more than 60% of our total software business in the next few years and during this shift, ARR is the best metric to evaluate our growth."  Looking ahead, Child added:  "We grew ARR by 54% in fiscal year 2020 and are targeting a 40% ARR CAGR over the next three fiscal years."

37.    A few weeks later, on March 26, 2020, Splunk issued its Annual Report on SEC Form 10-K, reporting the same financial performance mentioned above.  The Annual Report, signed by defendants Merritt and Child also stated:

Sales and marketing expenses primarily consist of personnel and facility-related costs for our sales, marketing and business development personnel, commissions earned by our sales personnel, and the cost of marketing and business development programs, including advertising programs to promote our brand and awareness, demand generating activities and customer events. *We expect that sales and marketing expenses will continue to increase, in absolute dollars, as we continue to hire additional personnel and invest in marketing programs*.

\*        \*        \*

We intend to continue investing for long-term growth. We have invested and intend to continue to invest heavily in product development to deliver additional features and performance enhancements, deployment models and solutions that can address new end markets. For example, during fiscal 2020, we released new versions of existing offerings such as Splunk ITSI and Splunk ES and introduced Splunk Data Fabric Search ("DFS") and Splunk Data Stream Processor ("DSP"). We also introduced Splunk Business Flow, a process mining solution that enables process improvement and business operations professionals to discover, investigate, and check conformance of any business process. *We expect to continue to aggressively expand our sales and marketing organizations to market and sell our software both in the United States and internationally*.

\*        \*        \*

Although our business has experienced significant growth, we cannot provide any assurance that our business will continue to grow at the same rate or at all. We have experienced and expect to continue to experience rapid growth in our headcount and operations, which has placed and will continue to place significant demands on our management and our operational and financial systems and infrastructure. As of January 31, 2020, approximately 35% of our workforce had been employed by us for less than one year. As we continue to grow, we must effectively integrate, develop and motivate a large number of new employees, while maintaining the effectiveness of our business execution and the beneficial aspects of our corporate culture and values. In particular, we intend to continue to make directed and substantial investments to expand our research and development, sales and marketing, and general and administrative organizations, as well as our international operations.

38.     On May 21, 2020, Splunk announced its financial results for the fiscal first quarter ended April 30, 2020. It reported "ARR Up 52% Year-Over-Year" and that "Cloud Revenue Grew 81%." Defendant Merritt added: "COVID-19 has transformed the world into one that requires rapidly accelerated digital transformation to keep organizations moving – we are seeing some resilient customers complete three-to-five year projects in just months. As customers continue to adapt to this new normal, data matters more than ever, evidenced by our continued strong momentum this quarter." "Data helps save lives. Data reimagines business. I'm extremely proud of our team's product vision and tenacity as we help our customers bring data to COVID-19 response and help get the world back to work." Defendant Child similarly stated: "Our shift to a SaaS model

1    is accelerating with cloud driving nearly half of total software bookings in the quarter with ARR

2    growing 52% year over year."  "We are also thrilled to have been recently added to the Fortune

3    1000, which is monumental recognition for a software company and a testament to the importance of

4    data in today's world."

5         39.    On May 21, 2020, defendants Merritt and Child held an earnings conference call for

6    Splunk shareholders and securities analysts to discuss Splunk's fiscal first quarter results.  During

7    the call, defendants Merritt and Child spoke on behalf of Splunk.  After their formal presentation,

8    defendants Merritt and Child took questions from attendees.  One analyst asked, "I want to talk a

9    little bit about where you are sort of seeing the momentum coming out of April into May, . . . [h]ow

10   sort of pipeline and sort of bookings, any sort of changes in end of April, May versus end of March

11   and April?"  In response, Merritt stated:

12            We haven't seen any material difference in customer interest and activity.
         ***There is a lot of concerted effort that the sales teams are driving along with
13       helping the marketing teams to make sure that we build an adequate pipeline***.  It's
         definitely – as you'd imagine, everyone's got to take different angles to build that
14       pipe.  Like many enterprise software companies, the field is responsible for a lot of
         that pipe gen, and that obviously comes from their activity day in and day out with
15       customers that they're visiting.  And now they're visiting virtually.

16            So as you – I'm sure, you've seen with other software and cloud companies,
         we've got a ton of virtual events.  ***Our campaign cadence remains high***.  We've
17       shifted the rest of the events that we're participating in through the end of the year to
         the virtual format.  We're seeing really high turnouts so far with people attending
18       different information sessions and ultimately, marketing events.  So, we're staying on
         top of serving customers and tight messaging around what's critical for cyber teams,
19       infrastructure teams and app dev teams to do their job effectively.

20         40.    During the same May 21, 2020 conference call, another analyst asked defendant

21   Child, "where is hiring, I guess, based on your thought process coming into this year?  I'd imagine

22   you guys might have had to rethink that in March.  And maybe what's the thought process on that

23   now?"  Child responded:

24            Yes.  Regarding head count.  So, yes, when everything started slowing down
         in early mid-March, we definitely did kind of put a freeze on hiring and look at what
25       – to try to get a better sense of what the environment was going to – how it's going to
         unfold.  It's been pretty clear that the underlying growth within our business is very
26       healthy.  ***So, we have been opening up hiring related to DQCs [direct quota-
         carrying sales representatives], of course, to serve the growth needs that are going
27       to continue***.  And then also, of course, there's some engineering head count related
         to a bunch of the migration work that we're continuing to do with really – in

28

particular with cloud as well as within cloud, within SignalFx and some of the integration work there.

*So, those areas we're definitely still hiring.* Most of the other areas, I think like most companies around are trying to make sure we're really focused on watching our cost structure closely and make sure that – especially with us going through a ratable transformation, we need to make sure that our cost structure doesn't outpace the growth revenue or it'll take a while for us to catch up.  So that's something we're watching very carefully.  *But again, we are mostly focused on making sure that we're making the necessary hires to manage to [sic] our growth targets.*

41.     Propelled by defendants' positive statements Splunk common stock skyrocketed, climbing to $196.80 per share on June 2, 2020 from $138.94 per share on March 2, 2020.  While Splunk common stock traded at artificially inflated prices, defendants Merritt and Child profited from the situation and collectively sold 53,755 of their personal Splunk common stock for $7,283,363.  Before selling they did not disclose adverse material, non-public information within their possession.  Specifically, they knew but failed to disclose that Splunk, rather than continuing to make investments in marketing and sales personnel, had halted investments in these two areas and curtailed Splunk's ability to achieve sustainable profitability.  Between March 2020 and June 2020, defendant Merritt sold 34,306 shares of Splunk common stock, at prices as high as $130.00 per share, for unlawful insider trading proceeds of $4,386,170 based on adverse material, non-public information.  Between March 2020 and June 2020, based on adverse material, non-public information, defendant Child sold 19,449 shares of Splunk common stock, at prices as high as $179.61 per share, for unlawful insider trading proceeds of $2,897,193.

42.     Additionally, while Splunk common stock traded at prices artificially inflated by defendants' false statements, Splunk completed a $1.2 billion debt offering on June 5, 2020.  But for defendants' false and misleading statements about the Company's marketing and hiring practices Splunk would not have been able to complete the debt offering.  Nor would defendants have positioned themselves to received increased executive compensation under a newly adopted compensation program that rewarded them for short-term cash flow gains rather than long-term earnings.

43.     On June 8, 2020, the *Silicon Valley Business Journal* published an article on defendant Merritt entitled "Splunk CEO Doug Merritt on Growing in San Jose and Why He's Not

Committing to No Layoffs This Year."  In the article, the reporter asked Merritt, "Have you made any commitments to not do any layoffs? Are you thinking about potential layoffs or cutbacks?"  In response, Merritt stated:

> I was pretty vocal internally that I am not going to make a commitment to no layoffs, only because it's such an uncertain time.  ***Right now things are going well for many tech companies, us included***, but I just didn't want to get in a position where I declared "Hey, no layoffs for the year," and ***then the worst-case scenario happens and I've got to go back and say "Hey, I'm sorry for that commitment***."
>
> The commitment I did make is our plans for the year are to grow headcount and spend. . . .  I still believe that we'll wind up with a bigger company in all ways at the end of calendar year 2020 versus what we entered calendar 2020.  Through Q1, that looks like the right decision as people are moving all digital really quickly and really dependent on IT infrastructure to actually work and cybersecurity resiliency and try and make sense of the data.
>
> The customer reaction has continued to be really strong for Splunk.  ***There would have to be some really unexpected shifts in the macro environment beyond what we've already modeled***.

44.     On August 26, 2020, Splunk announced its financial results for the fiscal second quarter ended April 30, 2020.  It reported "Cloud ARR Grows 89% to Over Half a Billion Dollars." Defendant Merritt added:  "As organizations continue to adapt to tectonic societal shifts brought on by COVID-19, one thing is constant: the power of data to radically transform business."  "I'm pleased to see the role Splunk's Data-to-Everything platform has played in helping our customers drive meaningful insights as they advance into The Data Age to meet the challenges of 2020 and beyond."  Commenting on Splunk's cloud business growth, Merritt continued:  "Splunk's cloud business continues to accelerate, now representing more than half of our software bookings in the quarter - a major milestone in our cloud journey."  "I'm very proud of our team, strong execution and continued momentum as we look forward to revealing our line-up of trendsetting product innovations at .conf20."

45.     Defendant Child similarly stated:  "Splunk's rapid transformation to the cloud has enabled us to reach key milestones ahead of schedule.  Cloud ARR growth accelerated to 89%, or $568 Million, far exceeding our expectations.  We also now have nearly 400 customers with ARR in excess of $1 million as more and more businesses embrace our cloud platform."  "Our customers

1   want the flexibility to transition to cloud, and with our diligent planning, we've continued to advance

2   our mission to remove the barriers between data and action."

3         46.   Propelled by defendants' positive statements Splunk common stock rose to $220.42

4   per share on August 24, 2020 from $199.91 per share on June 29, 2020.  While Splunk common

5   stock traded at artificially inflated prices, defendant Merritt profited from the situation and sold

6   30,514 shares of his personal Splunk common stock, at prices as high as $219.74 per share, for

7   $5,970,624.  Before selling Merritt did not disclose adverse material, non-public information within

8   his possession.  Specifically, he knew but failed to disclose that Splunk, rather than continuing to

9   make investments in marketing and sales personnel, had halted investments in these two areas and

10  curtailed Splunk's ability to achieve sustainable profitability.

11        47.   On September 14, 2020, defendant Child spoke on behalf of Splunk at the Jefferies

12  Software Virtual Conference.  After his presentation, Child took questions from attendees.  One

13  analyst asked Child "when you think about how your plans in hiring and adding direct quota-

14  carrying reps and going – kind of trying to get back to normal, how do you think about this year and

15  what changes you've made around hiring and go-to-market resources?  How has that shifted through

16  the year for you?"  Child responded:

17        And while I know a lot of folks in some of the companies have started – been very
          positive about macro – I think most of the companies have seen that have been
18        positive have also removed all their guidance, took it down and then now taking it
          part back up to some extent but not quite to where they started.  We're kind of one of
19        the few that actually has maintained our ARR guidance throughout the year.

20        And so from our perspective, we're continuing to hire DQCs.  We're having
          to – we're growing – we grew 50% ARR last quarter.  I think it's 6 or 7 quarters in a
21        row, over 50%.  And so it's just – with that kind of growth, we have to be continuing
          to invest in sales capacity.  Because again, we're not a self-service model.  We're –
22        the sales team drives all of the growth.  And then also now with cloud growth
          accelerating last quarter from 82% to 89%, now we're – well, between $400 million
23        to $1 billion, I think we're the fastest-growing cloud company on an ARR basis out
          there.  And so that means we also have to continue to staff up for capacity.
24
          And obviously, we gave out a 3-year CAGR that says we expect to maintain a
25        40% compounded annual growth from last year through FY '23.  And we haven't
          changed that guidance.  So we're definitely going to continue to be hiring.
26
          48.   Propelled by defendants' positive statements Splunk common stock skyrocketed,
27
    climbing to $216.51 per share on October 19, 2020 from $174.89 per share on September 14, 2020.
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 14 -

1    While Splunk common stock traded at artificially inflated prices, defendant Merritt and Child

2    profited from the situation and collectively sold 44,841 of their personal Splunk common stock for

3    $8,373,578.  Before selling they did not disclose adverse material, non-public information within

4    their possession.  Specifically, they knew but failed to disclose that Splunk, rather than continuing to

5    make investments in marketing and sales personnel, had halted investments in these two areas,

6    which curtailed Splunk's ability to grow revenues and achieve net profits.  Between September 2020

7    and November 2020, defendant Merritt sold 33,496 shares of Splunk common stock, at prices as

8    high as $186.92 per share, for unlawful insider trading proceeds of $6,187,558 based on adverse

9    material, non-public information.  Between September 2020 and November 2020, based on adverse

10   material, non-public information, defendant Child sold 11,345 shares of Splunk common stock, at

11   prices as high as $210.00 per share, for unlawful insider trading proceeds of $2,185,990.

12   **Defendants' Statements Were Knowingly**
     **False and Misleading When Made**

13

14   49.    Defendants' positive statements about Splunk's investments in marketing and its sales

15   force and sales efforts, and the positive impact of both on Splunk's ability to attract new customers

16   and drive sales enough to generate sustained profits rather than losses, were materially false when

17   made.  In fact, defendants were not causing Splunk to make investments in marketing initiatives to

18   build Splunk's brand recognition.  Nor were defendants causing the Company to invest in expanding

19   Splunk's sales force enough to service increased revenues.  Instead, as 2020 unfolded, defendants

20   curtailed the Company's operating expenses.  They suspended the Company's investments in

21   marketing initiatives, key to build up Splunk's brand recognition, in March 2020.  Defendants also

22   froze corporate hiring and laid off key employees, including the entire "new logo" group responsible

23   for developing new business.  Splunk let go of over 100 employees in April or May 2020.  Together,

24   these undisclosed actions significantly curtailed Splunk's sales pipelines and led to a significant

25   revenue shortfall in the third quarter of Splunk's fiscal year 2021.  They also derailed Splunk's

26   ability to achieve $1 billion in positive cash flow through revenue generation by 2023.

27

28

**The Truth Emerges**

50.     Defendants' unlawful stock scheme continued unabated until early December 2020. Then, on December 2, 2020, the Company stunned shareholders by disclosing a significant earnings shortfall for 3Q20, ended September 30, 2020.  Year-over-year total revenue declined 11%, missing estimates by nearly $60 million.  Splunk also announced that its 3Q20 net loss increased to $201.5 million – an almost four times greater loss than the prior year.  On a conference call the same day, defendants withdrew guidance that the Company would eclipse $1 billion in positive cash flow by 2023.

51.     The following day, defendant Child participated in an investor conference hosted by KeyBanc Capital Markets.  During the conference defendant Child discussed Splunk's wide earnings miss and admitted that key corporate decisions had been withheld from investors.  Specifically, defendant Child admitted that "[w]hen the pandemic hit" (*i.e.* early March 2020), Splunk "***suspended investments in marketing***" and "froze hiring" for "***a few months***."  He further admitted Splunk's corporate actions caused the Company to have "a tighter pipeline going into Q3" because of "the fact it usually takes a quarter or two to build your pipeline . . . especially for a company of [Splunk's] size."

52.     On this news, the trading price of Splunk common stock collapsed, falling to $158.03 per share on December 3, 2020 from $205.91 per share on December 2, 2020.  The 23% price decline wiped out over $7.7 billion in once valuable shareholders' equity.  Thereafter, Splunk shareholders sued defendants Merritt and Child, along with Splunk, for federal securities fraud.  The shareholder plaintiffs alleged that Merritt and Child made knowingly and materially false and misleading statements while speaking on behalf of Splunk about the Company's plans to achieve sustainable profitability through Splunk's continuing investments in marketing and sales personnel. On March 21, 2022, the U.S. District Court for the Northern District of California sustained most of the shareholder plaintiffs' claims.

**Defendants' Breaches of Fiduciary Duty**

53.     The defendants' misconduct that constitutes *prima facie* liability under the federal securities law also breached their fiduciary duties owed to Splunk.  After the truth emerged in

December 2020, Splunk shareholders sued for securities fraud, alleging that defendants Merritt and Child made knowingly false and misleading statements in violation of §§10(b) and 20(a) of the Exchange Act.  Because Merritt and Child spoke on behalf of Splunk, the shareholder plaintiffs named Splunk as a defendant in the federal securities class action as well.  On March 21, 2022, in a detailed order denying the motion to dismiss, the U.S. District Court for the Northern District of California, concluded that defendants Merritt and Child made knowingly materially false and misleading statements on May 21, 2020, June 8, 2020, and September 14, 2020, and, therefore, are *prima facie* liable for securities fraud under the stringent pleading and proof standards imposed by the PSLRA.

54.     Specifically, the District Court concluded that the statements made by defendants on May 21, 2020 were knowingly and materially false when made, stating: "When reading the operative complaint in the light most favorable to Plaintiff, as the Court must at this juncture, Plaintiff's allegations raise the reasonable inference that the challenged statements misled investors into believing, incorrectly, that Defendants' investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets."  The District Court continued:  "Because Merritt and Child conveyed positive information regarding the company's efforts to build 'adequate pipeline,' the 'cadence' of the company's sales and marketing campaigns notwithstanding the pandemic, the 'very healthy' underlying growth within the company's business, and the fact that the company was hiring sales employees as part of the company's effort to 'manage' its 'growth targets,' individual Defendants were obligated to disclose adverse information that cut against their positive representations in order to make such positive statements not misleading."  Addressing defendants' knowledge of the falsity of the May 21, 2020 statements, the District Court added:  "Plaintiff's averments also raise the inference that Defendants were aware of these adverse facts and of the likelihood that investors could be misled if they did not disclose them, not least because Defendants' own statements to analysts and investors had indicated that the company's investments in marketing and sales personnel were material to Splunk's ability to meet its growth and revenue targets. . . .  Defendants nevertheless failed to disclose these adverse

1    facts when they made the challenged statements in question, thus rendering the challenged

2    statements misleading."

3         55.    Next, the District Court addressed defendant Merritt's allegedly false statements

4    reported in the *Silicon Valley Business Journal* on June 8, 2020.  Here too the District Court

5    concluded that Merritt's statements were knowingly and materially false when made, stating: "When

6    reading the operative complaint in the light most favorable to Plaintiff, as the Court must at this

7    juncture, Plaintiff's allegations raise the reasonable inference that the challenged statements misled

8    investors into believing, incorrectly, that Defendants had not laid off employees or made cutbacks as

9    of when the statements were made.  Plaintiff's allegations raise the reasonable inference that, by the

10   time Merritt made the statements at issue, Defendants had already fired the 'new logo' team

11   responsible for building pipeline, had suspended investments in marketing, and had implemented a

12   hiring freeze of sales personnel, and that this played a role in the company's ultimate failure to build

13   adequate pipeline and meet its growth and revenue targets for Q3 2020."  The District Court

14   continued: "Because, when he was asked directly about layoffs and cutbacks, Merritt mentioned that

15   'things are going well' and that Defendants' intent was to 'grow headcount and spend,' Merritt was

16   obligated to disclose adverse information that cut against these positive representations in order to

17   make his statements not misleading."  As to Merritt's knowledge of the falsity of June 8, 2020

18   statements, the District Court added:  "Plaintiff's allegations support the reasonable inference that

19   Merritt's alleged failure to disclose the alleged layoffs and cutbacks that Defendants allegedly had

20   already made gave investors an impression of a state of affairs that differed materially from the one

21   that actually existed."

22        56.    Next, the District Court turned to defendant Child's allegedly false statements made

23   on September 14, 2020 at the Jefferies Virtual Software Conference.  The District Court also

24   concluded that Child's statements were knowingly and materially false when made, stating: "When

25   reading the operative complaint in the light most favorable to Plaintiff, as the Court must at this

26   stage, Plaintiff's allegations raise the reasonable inference that the challenged statements misled

27   investors into believing, incorrectly, that the company had not laid off any sales employees and had

28   not implemented a hiring freeze of sales personnel that lasted throughout the Class Period.  When

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 18 -

1   asked about the changes the company had made regarding hiring and go-to-market resources

2   'through the year,' Child made positive statements regarding Splunk's revenue growth relative to

3   other companies and touted the company's need to 'continue to be hiring' in order to achieve 'that

4   kind of growth.'" The District Court continued: "Because Child made these positive representations,

5   which suggested that the company had been growing in revenue and headcount, he was obligated to

6   disclose adverse information that cut against the positive representations in order to make his

7   statements not misleading. . . .  That adverse information, which Child did not disclose, was that

8   Defendants had implemented a hiring freeze of sales personnel in approximately March 2020 that

9   remained in place at the time that Child made the challenged statements at issue, and that the

10  company had fired the 'new logo' team responsible for building pipeline as of May 2020, to be

11  effective June 2020." As to Child's knowledge of the falsity of his September 14, 2020 statements,

12  the District Court added:  "The complaint raises the reasonable inference that Child had actual

13  knowledge of these adverse facts by virtue of his executive role within the company, of their

14  potential negative impact on the company's ability to build pipeline and meet its growth and revenue

15  targets, and of the likelihood that omitting such facts from the challenged statements could mislead

16  investors.  Plaintiff's allegations are sufficient, therefore, to raise the inference that the challenged

17  statements were misleading."

18          57.     The officers and directors of a Delaware corporation are duty-bound to speak the

19  entire truth whenever they communicate with shareholders through shareholder reports and other

20  means.  They are likewise prohibited from self-dealing, including selling shares of the corporation's

21  common stock based on adverse material, non-public information.  The rules are no different for

22  Splunk's top corporate executives – defendants Merritt and Child.  As detailed above, they

23  knowingly made materially false and misleading statements about the status of Splunk's investments

24  in marketing and sales personnel that a federal court already has adjudicated as *prima facie*

25  actionable under the federal securities laws.  The same false and misleading statements uttered by

26  defendants constitute a breach of the fiduciary duty they owed to Splunk to speak candidly and only

27  truthfully to Splunk shareholders in corporate communications.  Defendants' opportunistic insider

28  stock sales breached defendants' fiduciary duty to avoid self-dealing for personal profit based on

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 19 -

material, non-public corporate information.  Defendants' misconduct damaged and injured Splunk.

Therefore, the former are liable to the latter.

**DAMAGE AND INJURY TO SPLUNK**

58.     As alleged above, the statements and events described herein gave rise to the

Securities Action being initiated against the Company.  The Securities Action was sustained, in part,

on March 21, 2022, and the District Court's order in this regard presages continued damage and

injury to Splunk's assets, goodwill, and reputation.  *Splunk*, 592 F. Supp. 3d 919.

59.     Splunk has suffered additional damages as well.  For instance, Splunk is suffering and

will continue to suffer from what is known as the "liar's discount," a term applied to the stocks of

companies which have been implicated in improper behavior and have misled the investing public,

such that Splunk's ability to raise equity capital or debt on favorable terms in the future is now

impaired.  Further, as the Securities Action continues to unfold, Splunk will be further damaged by

the professional fees, costs, and expenses incurred in connection with that matter, not to mention the

decline in productivity associated with the distractions that come with exposure to such litigation.

60.     Defendants have not fared nearly so badly.  Defendants have collectively pocketed

$39.02 million in incentive-based compensation not justified by the Company's performance while

under their stewardship.  Nonetheless, the Board has not – and will not – protect the Company's

interests by bringing legal action against the directors and officers responsible for this debacle.

**THE BOARD'S DISDAIN FOR PLAINTIFF'S
LITIGATION DEMAND**

61.     Plaintiff incorporates ¶¶1-60.

62.     It is axiomatic that the directors of a Delaware corporation, like Splunk, owe the

corporation and its stockholders "'an affirmative duty to protect the interests of the corporation.'"

*Pfeiffer v. Toll*, 989 A.2d 683, 695 n.3 (Del. Ch. 2010) (quoting 1 Edward P. Welch et al., *Folk on*

*Delaware General Corporation Law* §141.2.1.2, at GCL-IV-26 (5th ed. 2006)).  Moreover,

Delaware directors have "'an obligation to refrain from conduct that would injure the corporation

and its stockholders.'"  *Id.*  As the Delaware Supreme Court recognized in *Unocal Corp. v. Mesa*

1  *Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985), the directors of a Delaware corporation must "protect

2  the corporate enterprise . . . from harm reasonably perceived, irrespective of its source."

3        63.    Here, the source of the harm to the Company arises from the multi-million-dollar

4  damages claims that investors have asserted against Splunk based largely, if not entirely, upon the

5  alleged false and misleading statements made by defendants, as well as the associated litigation

6  costs, expenses, and fees.  On March 21, 2022, this Court sustained the claims for securities fraud

7  against Splunk and the defendants, based on defendants' false and misleading statements.  *Splunk*,

8  592 F. Supp. 3d 919.  Splunk's damage claims and other relief against defendants are corporate

9  assets that the Board has an obligation to protect and preserve.  *Nagy v. Bistricer*, 770 A.2d 43, 55-

10  56 & n.23 (Del. Ch. 2000) (finding breach of fiduciary duty claims are assets of a company);

11  *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 548 (Del. Ch. 2015).  However,

12  following plaintiff's formal demand, initiated in September 2022, the Board has not taken steps to

13  protect and preserve the Company's valuable claims for breach of fiduciary duty of care, breach of

14  fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, or contribution and

15  indemnification against defendants.

16        64.    On September 12, 2022, plaintiff issued a formal written pre-suit demand to the

17  Splunk Board under Delaware law (the "September 12, 2022 Demand").  Therein, plaintiff

18  demanded that Splunk, acting by and through its board, take steps to preserve the Company's

19  valuable claims.  Specifically, plaintiff demanded that the Board immediately file a complaint

20  against defendants, and that such complaint shall:

21      •    The Company's complaint shall seek monetary damages against [defendants] for
22          breach of the fiduciary duty of care, breach of the fiduciary duty of loyalty, aiding
        and abetting breaches of the fiduciary duties of care and loyalty, and unjust
23          enrichment.

24      •    The Company's complaint shall seek contribution and indemnification against the
        [defendants] for losses sustained by the Company in connection with the Securities
25          Action.

26      •    The Company's complaint shall be filed in the U.S. District Court for the Northern
        District of California, where the Securities Action is pending, and the Company's
27          claims against the [defendants] should be adjudicated simultaneously.

28

- • Additionally, the Board shall immediately cause Splunk to file an amended answer in the Securities Action, and/or file a cross-complaint against the [defendants] in the Securities Action, asserting claims for relief for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, contribution, indemnification, and such other relief as the Board deems necessary to protect Splunk's interests against the [defendants].

*Id.* at 2-3. Plaintiff additionally demanded:

> [S]hould there be a resolution of the Securities Action without a trial, Splunk shall not contribute any cash or other consideration towards funding a settlement. Instead, the [defendants] shall bear 100% responsibility for resolving the claims asserted in the Securities Action. Should a judgment for damages be entered in the Securities Action, Splunk shall pay no amount in damages greater than its proportionate share of liability, as determined by the Court. In other words, the [defendants] shall solely bear 100% of the responsibility for their respective proportionate share(s) of liability.

*Id.* at 3.

65.   In a letter dated September 28, 2022, Mr. Andrew Ehrlich of Paul, Weiss, Rifkind, Wharton & Garrison LLP informed plaintiff's counsel that Splunk had formed a "Demand Review Committee" in response to the September 12, 2022 Demand. The Committee was formed to address the allegations in the September 12, 2022 Demand and had retained Paul, Weiss, Rifkind, Wharton & Garrison LLP to advise them. Neither the Committee, nor the Board, has issued a substantive response to the September 12, 2022 Demand.

66.   The Board's conduct is antithetical to its affirmative duty to protect the interests of Splunk and to refrain from conduct that would injure the corporation. By failing to act upon the demand, the Board has failed in its "fundamental duty and obligation to protect the corporate enterprise." *Unocal*, 493 A.2d at 954. Therefore, by virtue of its own actions, the Board has refused the demand. Accordingly, plaintiff may proceed with this derivative action designed to protect the interests of Splunk vis-à-vis the defendants by, among other things, perfecting the Company's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution and indemnification, and related damages against defendants.

## COUNT I

### Breach of Fiduciary Duty
### (Against All Defendants)

67.   Plaintiff incorporates ¶¶1-60.

68.     Each Defendant owed, or owe, Splunk and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision.  These duties include the duty of full and fair disclosure when choosing to speak to shareholders, also known as the duty of candor.  To execute this duty, defendants were required to disseminate accurate, truthful, and complete information to shareholders always.

69.     In direct violation of these duties, defendants, and each of them, knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning Splunk's suspension of marketing investment and multi-month hiring freeze in response to the COVID-19 pandemic, and, as a result of the foregoing, Splunk's public statements were materially false and misleading at all relevant times.  Through their fraudulent scheme, defendants artificially inflated the Company's financials, and its stock price.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

70.     As a direct and proximate result of defendants' failure to perform these fiduciary obligations, Splunk has sustained significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

71.     Plaintiff, on behalf of Splunk, has no adequate remedy at law.

**COUNT II**

**Unjust Enrichment**
**(Against All Defendants)**

72.     Plaintiff incorporates ¶¶1-60.

73.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of, and to the detriment of, Splunk.

74.     Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to Splunk.

75.     Plaintiff, as a shareholder and representative of Splunk, seeks restitution from defendants, the imposition of a constructive trust over defendants' proceeds from their misconduct,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and/or an order requiring defendants to disgorge all profits, benefits, and other compensation obtained through, or because of, their wrongful conduct and fiduciary breaches.

76.    As a direct and proximate result of defendants' misconduct, the Company has suffered significant damages, as alleged herein.

77.    Plaintiff, on behalf of Splunk, has no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets
### (Against All Defendants)

78.    Plaintiff incorporates ¶¶1-60.

79.    Defendants, and each of them, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Splunk's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.  It resulted in continuous, connected, and ongoing harm to the Company.

80.    Defendants, and each of them, wasted corporate assets by:  (i) paying excessive compensation and bonuses to certain of its executive officers; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions, including defending the Company and its officers against the Securities Action.

81.    As a result of the waste of corporate assets, defendants are liable to the Company.

82.    As a direct and proximate result of defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

83.    Plaintiff on behalf of Splunk, has no adequate remedy at law.

## COUNT IV

### For Contribution for Violations of §§10(b) and 21D of the Exchange Act
### (Against All Defendants)

84.    Plaintiff incorporates ¶¶1-60.

85.    Defendants Child and Merritt are named defendants in the Securities Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 24 -

86.     Splunk is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, *inter alia*, violations of §10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of defendants as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Action against the Company.

87.     Defendants, as officers, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Splunk, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and Rule 10b-5.  Further, defendants are liable under §21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

88.     As a result, defendants damaged Splunk and are liable to the Company for contribution.

## COUNT V

### For Contribution and Indemnification Under Delaware Law
### (Against All Defendants)

89.     Plaintiff incorporates ¶¶1-60.

90.     This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants.

91.     Splunk is named as a defendant in the Securities Action.  If Splunk is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of defendants as alleged herein.

92.     Accordingly, Splunk is entitled to all appropriate contribution or indemnification from defendants, who are responsible for exposing Splunk to liability under Delaware contribution and indemnification law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 25 -

1

**PRAYER FOR RELIEF**

2      WHEREFORE, plaintiff demands judgment as follows:

3      A.    Against all defendants for the damages sustained by the Company as a result of

4  defendants' wrongdoing as alleged herein;

5      B.    Awarding Splunk restitution from defendants, and ordering disgorgement of all

6  profits, benefits, and other compensation obtained by each of them;

7      C.    Awarding to plaintiff the costs and disbursements of the action, including reasonable

8  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9      D.    Granting such other and further relief as the Court deems just and proper.

10

**JURY DEMAND**

11      Plaintiff demand a trial by jury on all issues so triable.

12  DATED:  March 21, 2023                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
13                                            SHAWN A. WILLIAMS (213113)

14

15                                            _____
                                                    SHAWN A. WILLIAMS
16

17                                            Post Montgomery Center
                                              One Montgomery Street, Suite 1800
18                                            San Francisco, CA  94104
                                              Telephone:  415/288-4545
19                                            415/288-4534 (fax)

20                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
21                                            TRAVIS E. DOWNS III (148274)
                                              BENNY C. GOODMAN III (211302)
22                                            ERIK W. LUEDEKE (249211)
                                              655 West Broadway, Suite 1900
23                                            San Diego, CA  92101
                                              Telephone:  619/231-1058
24                                            619/231-7423 (fax)

25                                            Attorneys for Plaintiff

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 26 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUGARMAN SUSSKIND BRASWELL
  & HERRERA, P.A.
ROBERT A. SUGARMAN
PEDRO A. HERRERA
150 Alhambra Circle, Suite 725
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiff